**CECILE INDUSTRIES, INC./Ronald Lipshie, Trustee in Bankruptcy, Appellant,**

v.

**Dick CHENEY, Secretary of Defense, Appellee.**

No. 92–1010.

United States Court of Appeals, Federal Circuit.

June 15, 1993.

Rehearing Denied Aug. 10, 1993.

Marc Lamer, Kostos & Lamer, P.C., Philadelphia, PA, argued for appellant.

John K. Lapiana, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and James M. Kinsella, Asst. Director. Also on the brief was Kathleen D. Hallam, Office of General Counsel, Defense Personnel Support Center, Philadelphia, PA, of counsel.

Before PLAGER, and RADER, Circuit Judges, and PLUNKETT, District Judge.*

RADER, Circuit Judge.

Cecile Industries, Inc. (Cecile) appeals from a decision of the Armed Services Board of Contract Appeals. The Board held that the administrative offset provisions of the Debt Collection Act of 1982, Pub.L. No. 97–365 § 10, 96 Stat. 1749, 1754–55 (1982), codified at 31 U.S.C. § 3716 (1988) (DCA), do not apply to the Federal Government's offset of money within a single contract. *Cecile Industries, Inc./Ronald Lipshie, Trustee in Bankruptcy,* 91–3 BCA (CCH) ¶ 24,099 at 120,626, 1991 WL 129851 (1991). The Board also permitted the Government to cure its failure to comply with those provisions before effecting an offset between separate contracts with Cecile. *Id.* at 120,627. Because the DCA did not abrogate or constrict preex-

isting common law rights to intra- or inter-contractual offsets, this court affirms.

*Background*

On June 14, 1979, the Defense Personnel Support Center (Center) awarded Cecile contract DLA100–79–C–2851 (contract 2851) for the manufacture of 40,572 extreme cold weather sleeping bags at a price of $3,634,034.04. The contract called for insulation in the bags to contain more than 80% goose down. Contract 2851 also contained a Value Engineering Clause, which entitled Cecile to share in any cost savings suggested by Cecile. Due to a cost-saving suggestion, Cecile earned $272,865.30 in Value Engineering royalties.

Later the Center awarded Cecile contracts DLA100–81–C–2414 (contract 2414) and DLA100–82–C–4247 (contract 4247) for additional sleeping bags. Both contracts contained a standard Government Furnished Material (GFM) bailment clause. Under this clause, the Center supplied basic materials to Cecile and deducted their cost from the contract price. Cecile did not use all of the furnished materials. Therefore it returned unused materials for a refund. The GFM refunds due to Cecile totaled $18,853.15 under contract 2414 and $65,587.22 under contract 4247.

Cecile delivered the bags covered by contract 2851 and received full payment. The Center discovered later that the bags did not contain 80% goose down. After Cecile failed to correct the problem, the Center terminated the contract for default. The estimated cost of correcting the problem came to $1,605,998.40. The Center reduced the contract price by that amount. Cecile did not appeal the termination or the price reduction.

When Cecile sought payment under the Value Engineering clause of contract 2851, the Center offset the royalty amount against Cecile's debt from the nonconforming bags. The Center also withheld Cecile's GFM refunds under contracts 2414 and 4247 as offsets against Cecile's debt from contract 2851.

* The Honorable Paul E. Plunkett, United States District Court for the Northern District of Illinois, sitting by designation.

Cecile submitted a claim to the contracting officer seeking release of these withheld funds. When the contracting officer did not issue a final decision, Cecile appealed to the Board.

The Board held that the DCA did not apply to the mutual offset of debits and credits between parties under the same contract. Thus, the Board concluded, the notice and opportunity provisions of 31 U.S.C. § 3716 did not apply to the Center's withholding of Value Engineering royalty payments under the 2851 contract. The Board applied, however, those provisions to the Center's inter-contractual offsets of GFM refunds under contracts 2414 and 4247. The Board gave the Center ninety days to cure its failure to comply with those provisions.

### Standard of Review

The scope of this court's review of Board decisions is set forth at 41 U.S.C. § 609(b) (1988):

[T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

This court thus reviews the Board's legal conclusions de novo. Federal Data Corp. v. United States, 911 F.2d 699, 702 (Fed.Cir. 1990). The Board's interpretation of the scope of the DCA presents such a legal question reviewable under the de novo standard.

### The Debt Collection Act

██ 31 U.S.C. § 3716 provides notice and other procedural protections when the Government undertakes to collect a debt by administrative offset:

(a) After trying to collect a claim from a person under section 3711(a) of this title, the head of the executive or legislative agency may collect the claim by administrative offset. The head of an agency may collect by administrative offset only after giving the debtor—

(1) written notice of the type and amount of the claim, the intention of the head of the agency to collect the claim by administrative offset, and an explanation of the rights of the debtor under this section;

(2) an opportunity to inspect and copy [relevant agency records];

(3) an opportunity for a review within the agency of the decision of the agency related to the claim; and

(4) an opportunity to make a written agreement ... to repay the amount of the claim.

31 U.S.C. § 3701(a)(1) defines "administrative offset" to mean "withholding money payable by the United States Government to, or held by the Government for, a person to satisfy a debt the person owes the Government."

This court must determine whether the DCA abrogates or constricts the Government's long-standing common law right to offset contract debts against contract payments. Indisputably, the Government has long enjoyed the right to offset contract debts to the United States against contract payments due to the debtor. See, e.g., United States v. Munsey Trust Co., 332 U.S. 234, 239, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947); Project Map, Inc. v. United States, 486 F.2d 1375, 1376, 203 Ct.Cl. 52 (1973); Madden v. United States, 371 F.2d 469, 470, 178 Ct.Cl. 121 (1967). This right extends to offsets between separate contracts which the debtor may have with the Government. Project Map, 486 F.2d at 1376–77; Dale Ingram, Inc. v. United States, 475 F.2d 1177, 1188, 201 Ct.Cl. 56 (1973). In other words, the right to offset applies to inter-contractual debts as well as intra-contractual debts.

The United States Supreme Court has directed:

Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident. In such cases, Congress does not write upon a clean slate.

*United States v. Texas,* —— U.S. ——, ——, 113 S.Ct. 1631, 1634, 123 L.Ed.2d 245 (1993) (ellipsis in original, citations omitted); *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1015, 96 L.Ed. 1294 (1952); *see also Astoria Federal Savings & Loan Assn. v. Solimino,* —— U.S. ——, —— – ——, 111 S.Ct. 2166, 2169–70, 115 L.Ed.2d 96 (1991). Thus, without an evident statutory mandate to the contrary, this court must avoid reading the DCA to restrict the common law right of contractual offset.

The language of the DCA does not contain a clear mandate to abrogate or severely restrict the Government's common law contractual offset rights. The enacting clause of the DCA stated the Act's purpose:

> To increase the efficiency of Government-wide efforts to collect debts owed the United States and to provide additional procedures for the collection of debts owed the United States.

Pub.L. No. 97–365, 96 Stat. 1749, 1749 (1982); *see also* S.Rep. No. 378, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S.C.C.A.N. 3377, 3378. Significantly, this statement of purpose speaks of "additional procedures" for debt collection, not replacement or revision of existing contract law doctrines. The Supreme Court read this purpose to "suggest[ ] that Congress passed the Act in order to strengthen the Government's hand in collecting its debts." *Texas,* —— U.S. at ——, 113 S.Ct. at 1636.

Application of the Act's notice and opportunity requirements to contractual offset procedures would defeat the purpose of providing the United States additional procedures to collect debts. Rather the Act's procedures would reduce the Government's debt collection options by prohibiting exercise of common law contract rights without satisfying previously nonexistent conditions. Under such a reading, the DCA would not "strengthen the Government's hand in collecting its debts," but would instead limit the Government's use of a valuable common law collection tool. Thus, the enacted purpose of the Act underscores that it does not apply to restrict the common law doctrines governing contractual offsets.

The language of the 1982 Act also shows that an administrative offset under section 3716 is a last resort which an agency "may" use "after" other collection efforts fail. 31 U.S.C. 3716(a); *see also* S.Rep. No. 378 at 12, 1982 U.S.C.C.A.N. at 3388 ("The administrative set-off procedure should be used primarily as a last resort action where other administrative steps have been taken to collect the debt."). Section 3716 permits an agency to invoke the procedure only after trying to collect under section 3711(a). Section 3711(a), in turn, allows an agency to follow its own collection procedures. 31 U.S.C. § 3711(e). Thus section 3716 does not apply when an agency can otherwise collect claims, as the Center did here. The Center applied its own regulations, Defense Acquisition Regulations Appendix E, Part 6, 31 C.F.R.App. E, Part 6 (1983), to Cecile's payments and debts. Therefore, the Center did not employ an administrative offset under section 3716. Section 3716's requirements do not apply to the Center's offsets.

■ This court must also read the Act within its proper context in the entire United States Code. The Code includes the Contract Disputes Act of 1978 (CDA). 41 U.S.C. §§ 601–613 (1988). The CDA exclusively governs Government contracts and Government contract disputes. *See Cascade Pacific Int'l v. United States,* 773 F.2d 287, 296 (Fed.Cir.1985). The comprehensive procedures of the CDA govern disputes over contract rights, such as this dispute between Cecile and the Center. Had Cecile chosen to dispute the Center's termination order, the CDA would have governed the litigation of that claim. Within its comprehensive scheme of protections and procedures for contract disputes, the CDA accommodates contractual offsets. *See, e.g., Placeway Constr. Corp. v. United States,* 920 F.2d 903 (Fed.Cir.1990); *Cascade Pacific,* 773 F.2d 287.

The CDA clearly and comprehensively defines the procedures for all contractual disputes between the United States and private contractors. In the absence of a statutory directive, this court is reluctant to construe the DCA to inject "a new procedural matrix [in]to every contract." *Avco Corp. v. United*

*States*, 10 Cl.Ct. 665, 667 (Cl.Ct.1986). The DCA does not suggest such a sweeping change in the procedure and substance of government contracting rules. Rather the comprehensiveness and exclusivity of the 1978 Act and the silence of the 1982 Act suggest that the DCA did not supplant or restrict the established procedures for contractual offsets accommodated by the CDA.

In addition to its language and context, the statute's enactment history also suggests that the DCA provides procedures for recovery of a different set of debts. Rather than the contractual obligations at issue in this case, the DCA targets recovery of delinquent debts such as "$13.2 billion in unpaid taxes, $7.7 billion in overdue loans, and the remainder for overdue interest and overpayments to program beneficiaries." S.Rep. No. 378 at 3, 1982 U.S.C.C.A.N. at 3379.

The DCA's enactment history further suggests that section 3716 expands the Government's use of offset beyond those instances already permitted by common law or statute. The report accompanying the 1982 Act stated:

> Most important, ... federal agencies are unable to use the same techniques and tools commonly used in private sector credit management and debt collection due to the Privacy Act and other legal restrictions.
>
> ... [L]egal restrictions have limited government's ability to screen applicants for unpaid debts, use IRS addresses as a means of locating debtors, *offset[ ] other government benefits and payments as a means of collection*, and other potentially effective collection techniques.

*Id.* (emphasis supplied). Thus, the report expressly noted that the DCA provided offset rights for situations where the Government had not previously enjoyed the "techniques and tools commonly used in [the] private sector ... [for] debt·collection." *Id.* Before the enactment of the DCA, the Government possessed a common law right to offset contractual rights against contractual payments. In sum, the administrative offset provision of the DCA extended this collection procedure to debts other than the purely contractual debts at issue in this case. Nowhere does the language, context, or enactment history of the DCA suggest restriction or replacement of doctrines permitting contractual offsets.

### Conclusion

■ Because the Debt Collection Act does not govern the Government's common law right to offset contractual debts, the Board correctly determined that the Center possessed an independent common law right to offset Cecile's debts under contract 2851 against payments due to Cecile under contract 2851. However, the Center also possessed the same right to offset Cecile's debt against payments due to Cecile under contracts 2414 and 4247. The Center did not need to avail itself of section 3716 for any of the offsets. Thus, the Center did not need to satisfy the notice and opportunity requirements of section 3716. Accordingly, the Board erred in holding that the Center needed to comply with section 3716 for the GFM offsets affecting contracts 2414 and 4247. That error was harmless, however, because the Board provided the Center with an opportunity to cure the noncompliance. Otherwise, this court affirms the Board's decision.

### Costs

Each party to bear its own costs.

AFFIRMED.